**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OMEGA DASHA SMITH, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> ) | No. 16 CV 9976 <br><br> Magistrate Judge Michael T. Mason |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff Omega Smith ("Claimant") filed a motion for summary judgment seeking reversal of the final decision of the Commissioner of Social Security ("Commissioner"), finding that her disability ended on November 1, 2012. The Commissioner has filed a cross-motion asking the Court to uphold the previous decision. For the reasons set forth below, Claimant's motion for summary judgment (Dkt. 15) is granted and the Commissioner's motion for summary judgment (Dkt. 16) is denied.

**I. Background**

    **A. Procedural History**

In a previous determination by an Administrative Law Judge ("ALJ") (that is not in the record before the Court), Claimant was found to be disabled and entitled to Supplemental Security Income ("SSI") as of June 9, 2009 due to Listing level major depressive disorder and generalized anxiety. (R. 76.) But on November 21, 2012, following a periodic review of Claimant's disability, the Social Security Administration

1

("SSA") determined that Claimant's condition had improved and her disability had ended as of November 1, 2012. (R. 76, 78-80, 82.) This determination was upheld at the reconsideration level following a hearing by a Disability Hearing Officer ("DHO"). (R. 89-100, 105-115.) Claimant then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on November 24, 2014. (R. 42.) On March 16, 2015, the ALJ issued a written decision, affirming the decision that Claimant's disability ended on November 1, 2012. (R. 22-36.) On August 26, 2016, the Appeals Council denied Claimant's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-3.) This action followed.

### B. Relevant Medical Evidence

#### 1. Treating Physicians

Again, Claimant was previously granted benefits in 2009 for Listing level depression and anxiety. The medical records from that time period are not in the record before the Court. However, it appears that, among other things, Claimant suffered from obesity, appetite disturbance, sleep disturbance, difficulty concentrating and thinking, and paranoia. (R. 394.)

The medical records currently before the Court date back to July 2009 and demonstrate visits with psychiatrist Dr. Doshi about every three months through 2014. (R. 269-73.) At the first visit in July 2009, Dr. Doshi assessed general anxiety disorder and depression, and a GAF score of 40-50. (R. 269.) Over the course of her treatment with Dr. Doshi, Claimant often reported she was "doing well." (R. 270-73.) At other times, she reported lingering anxiety and increased symptoms due to certain events. (*Id.*) For example, she complained of increased depression following the 2010 holiday

season and increased anger following a verbal altercation in 2012. (R. 271-72.) She also reported that she suffers from nightmares. (R. 271.) Throughout this period, Claimant continued to take Prozac and Klonopin.

In November 2011, Claimant's counselor, Ms. Neely, completed an updated mental health assessment. (R. 324-33.) The mental status exam yielded normal results. (R. 324.) Claimant reported she enjoyed watching television, shopping, and her son's school activities. (R. 330.) She explained that she gets support from her mother and grandmother, and can "usually" communicate with others. (*Id.*) Overall, things were "going well," though she admitted to "some anxiety when dealing with family." (R. 332.) Claimant's diagnoses and GAF score were the same as previously assessed by Dr. Doshi. (R. 333.)

In April 2012, Claimant reported to the ER complaining of back pain after lifting a heavy object. (R. 307.) She described a history of depression. (*Id.*) She was given pain medication and discharged. (R. 301.) Claimant returned to the ER in August 2012 due to bilateral knee pain and swelling. (R. 315.) The examining physician assessed arthritis, prescribed pain medication, and advised Claimant to follow up with a primary care physician. (R. 314.)

Ms. Neely completed another updated health assessment in November 2012. (R. 369-78.) Though the mental status exam was normal, Claimant reported she had good days and bad days, and had been suffering from recent mild knee pain. (R. 369, 371.) She said she keeps to herself because she does not communicate well with others. (R. 375.) Overall she was doing well, and taking her medication as prescribed. (R. 377.) By early 2013, Claimant's suicidal ideations had increased due to the holiday

season. (R. 379.) She was doing "about the same" in April 2013, and she was sleeping well, but "irritable at times." (R. 408). Her complaints of knee pain also continued at that time. (R. 464.) She had no complaints in January 2014, though her grandmother was doing poorly. (R. 407.) Her Klonopin dosage was increased later that year. (*Id.*) Also, in August 2014, Claimant was treated for tendinitis in her left foot. (R. 436-39.)

By January 2015, Dr. Doshi described Claimant as "stable enough." (R. 413.) Dr. Doshi also completed a mental impairment questionnaire. (R. 404-06.) He indicated that Claimant's medication partially helps her symptoms and described her prognosis as "ongoing." (R. 404.) He indicated that Claimant suffered from: change in personality, irrational fear, emotional withdrawal, difficulty concentrating, panic attacks, isolation, sleep disturbance, and decreased energy. (R. 405.) He opined that Claimant suffers from marked limitations in activities of daily living and maintaining concentration, persistence and pace; extreme limitations in social functioning; and four or more episodes of decompensation. (*Id.*)

At general physical visits over the years, Claimant usually denied feeling "down, depressed or hopeless" in response to the general depression screening. (R. 278, 286.)

### 2. Agency Physicians

In November 2012, Claimant underwent an internal medicine consultative exam with Dr. Karri. (R. 336-39.) She described a history of depression, anxiety, arthritis in the knees, low back pain, and obesity. (R. 336.) She could do some driving, but said she did not do chores at home. (R. 337.) A physical exam revealed crepitus and

4

tenderness in her knees, and decreased range of motion of the lumbar spine. (R. 338.) A mental status exam was normal, though Claimant was somewhat anxious. (*Id.*)

Also in November 2012, a reviewing physician opined that Claimant suffered from non-Listing level depression and anxiety that would cause mild limitations in daily activities and moderate limitations in social functioning and concentration, persistence and pace. (R. 341-54.) Specifically, the agency physician opined that Claimant would be moderately limited in her ability to work with others and to accept instructions and respond appropriately to criticism. (R. 363-65.) From a physical standpoint, another agency physician determined that Claimant could perform light work, with only occasional climbing of ladders, ropes, and scaffolds due to her history of arthritis and back pain. (R. 355-62.) Due to her asthma, she should also avoid concentrated exposure to fumes. (R. 359.)

Similar physical RFC findings were made at the reconsideration level in March 2013. (R. 396-403.) However, from a mental standpoint, the reviewing physician determined that Claimant would only suffer from mild limitations in daily activities and maintaining social functioning. (R. 392.) In his opinion, medical improvement had occurred since the previous decision awarding benefits. (R. 394.) The DHO also found that medical improvement had occurred and that Claimant could perform her past work as a daycare center worker. (R. 105-114.)

**C. Claimant's Testimony**

Claimant appeared at the hearing with counsel and offered the following testimony. At the time of the hearing, she was 38 years old and living with her two

5

children, ages 11 and 15. (R. 48-49.) She did not finish high school and had not worked since 2003 when she was a part-time teacher's aide. (R. 49.)

Claimant explained that she has difficulty dealing with stress, pressure and anger, and often shuts down or has an outburst. (R. 56-60.) She suffers from regular crying spells and has vivid nightmares of being hurt or chased, which cause paranoia and a fear of crowds. (R. 58-61.) Claimant estimated that she reads at a fifth grade level and explained that her attention span "wouldn't be that good" in a work setting. (R. 60-61.) Claimant testified that she had been seeing her psychiatrist every two to three months since about 2009, and her current therapist every two weeks since about 2011. (R. 55.) Although in the past she had problems taking her medications consistently, she testified that she had been more consistent over the past year. (R. 57.) She had not completed any inpatient mental health treatment, but sometimes feels like she should. (R. 57.)

From a physical standpoint, Claimant testified that she had been under the care of a doctor for arthritis in her knees for the past few years, and also suffers from back pain. (R. 50, 54.) She takes pain medication and had recently undergone physical therapy for a problem with her Achilles tendon. (R. 50-51.) She was prescribed an inhaler in the past for breathing difficulties, but had not used it recently. (R. 65.) According to Claimant, she is unable to stand for more than ten minutes at a time and has trouble getting up and down the stairs. (R. 52.) She struggles to complete household tasks because she has to take breaks. (R. 52-53.)

Claimant has one friend that she can call, but otherwise does not socialize with friends or family. (R. 53, 63.) She does not attend her kids' school activities because

she does not like the crowds. (R. 53, 60.) Her mom comes over to help two or three times a week, particularly on bad days when she is overwhelmed and tired. (R. 62-63.) When asked by her attorney if things had gotten better or worse since her last hearing, she testified that she had not gotten better and that she just wanted "to get help" in the way of someone she could talk to more frequently. (R. 64.)

### D. Vocational Expert's Testimony

A vocational expert ("VE") also appeared at the hearing. Based on a hypothetical posed by the ALJ (describing someone with the RFC indicated below), the VE testified that such an individual could work as a cashier, hand packager, or assembler. (R. 67-68.) The VE also testified that an individual who would be off task 25% of the day, three times a week, could not sustain employment in those jobs. (R. 69.) Upon questioning by Claimant's counsel, the ALJ confirmed that being off task 15-20% of the day multiple times a week would also preclude employment. (R. 70.) The VE also agreed that the cashier job would include potentially stressful rush periods, and that the other two jobs would likely carry certain production requirements. (R. 70-71.) Lastly, the VE explained that during an initial probationary period of employment, absences would likely not be tolerated. (R. 71.)

## II. Analysis

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence … [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B. Analysis under the Social Security Act**

To be eligible for SSI benefits, a claimant must be disabled under the Social Security Act. A claimant is disabled if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.A. § 1382c(a)(3)(A). After the SSA determines that a claimant is disabled, it must evaluate the claimant's impairments "from time to time" to determine if the claimant remains eligible for benefits.

20 C.F.R. § 416.989. When determining a claimant's continued eligibility for benefits, the SSA must consider whether there has been any "medical improvement" in the claimant's impairments and, if so, whether the improvement is related to the ability to work. 20 C.F.R. § 416.994. In addition, the SSA must establish that the claimant is able to engage in substantial gainful activity before determining she is no longer disabled. *Id.* To make these determinations, ALJs are expected to follow a seven-step process laid out in 20 C.F.R. § 416.994(b)(5).

Here, the ALJ applied the seven-step process when assessing whether Claimant continued to be disabled and entitled to SSI. First, the ALJ acknowledged that at the time of the "comparison point decision," Claimant suffered from Listing level severe impairments of major depressive disorder (Listing 12.04) and generalized anxiety disorder (Listing 12.06) (R. 23.) Next, the ALJ found that as of November 1, 2012, Claimant had the following severe impairments: depression, anxiety, obesity, and chronic degenerative joint disease in both knees. (R. 24.) He did not find Claimant's back pain, tendonitis, or asthma to be severe. (*Id.*) According to the ALJ, Claimant's impairments no longer met any of the SSA's Listings, including Listings 12.04, 12.06, and 1.02 (dysfunction of joints). (R. 24-26.)

At step two, the ALJ concluded that medical improvement had occurred as of November 1, 2012. (R. 27.) In doing so, the ALJ cited to the previous ALJ's decision and some of the evidence apparently cited therein. (*Id.*) Ultimately, the ALJ determined that Claimant's symptoms had improved, in part because she often reported "doing well," and continued to take her prescribed medication. (*Id.*) The ALJ found Claimant's medical improvement related to her ability to work at step three because she no longer

9

had symptoms of Listing-level impairments.  (R. 27-28.)  But the ALJ did find that Claimant's impairments continued to cause more than minimal limitations in her ability to work.  (R. 28.)

The ALJ went on to assess Claimant's RFC, finding that Claimant could perform light work as defined in 20 C.F.R. 416.967(b), except that she could not climb ladders, ropes, or scaffolds; could only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and must avoid concentrated exposure to pulmonary irritants.  (R. 28-35.)  Further, the ALJ found that Claimant could understand, remember and complete simple instructions; execute simple workplace judgments; and perform work involving occasional decision-making and changes in the work setting.  (*Id.*)  She must have no more than brief and superficial interactions with the general public and only occasional contact with co-workers and supervisors.  (*Id.*)  Claimant had no past relevant work to consider at step six.  (R. 35.)  But at the final step, based on Claimant's RFC and the testimony of the VE, the ALJ found that Claimant could perform work in the national economy, including in the positions of cashier, hand packager, and assembler.  (R. 35-36.)

Claimant now argues, for a number of reasons, that the ALJ's decision is not supported by substantial evidence and requires remand.  The Court agrees.

### C. The ALJ's Decision is Not Supported by Substantial Evidence and Remand is Required.

First, the Court would be remiss not to point out a concern that was raised only in passing by Claimant and that was not addressed by the Commissioner.  As mentioned above, the administrative record before the Court does not include the previous ALJ's opinion or the records relied upon to find Claimant disabled.  The Court acknowledges

10

that the ALJ referenced the earlier opinion and that the DHO's report described some of the previous evidence. But without the benefit of the actual records and previous opinion, it is difficult to determine whether the ALJ made a proper comparison of the previous records and the current records. *See Bartruff v. Astrue*, No. 12 CV 571, 2013 WL 498790, at *6 (S.D. Ill. Jan. 10, 2013), report and recommendation adopted, No. 12 CV 571, 2013 WL 498788 (S.D. Ill. Feb. 8, 2013) ("[Medical improvement] is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)."). It is worth noting that courts in other jurisdictions have remanded on this basis even where, as here, some of the earlier records were otherwise summarized in the current record. *See, e.g. Medina v. Colvin*, No. 14 CV 01967, 2015 WL 5448498, at *11 (N.D. Cal. Aug. 21, 2015); *Veino v. Barnhart*, 312 F.3d 578, 587 (2d Cir. 2002) ("The Commissioner also argues that the record before us is adequate because the 1982 medical evidence was summarized in the Hearing Officer's decision....The difficulty with the Commissioner's position is that these decisions are not evidence .... without any of the 1982 medical evidence in the record before us, this Court cannot make a reasoned determination as to whether the DHO's summary is accurate or adequate.").

Notwithstanding the lack of a full record, the Court agrees that the ALJ's opinion is otherwise flawed. Though the ALJ summarized some of the current medical evidence, he relied too heavily on Dr. Doshi's progress notes that Claimant was "doing well." In doing so, he improperly glossed over, or otherwise ignored, some of Dr. Doshi's notes reflecting occasional ups and downs in her progress, often triggered by

11

interactions with others or circumstances outside her control (both of which would occur in the workplace).  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").  Further, without the previous records, it is hard to know whether the ups and downs are consistent with Claimant's history, which, if they were, could weigh in favor of continued disability.

The ALJ was also quick to discredit the opinion of Dr. Doshi, who had been treating Claimant regularly for over five years.  As explained above, Dr. Doshi's opinion was that Claimant suffered from a number of debilitating symptoms that caused her marked and extreme limitations.  From what we do know, the symptoms recognized by Dr. Doshi are similar to those previously found to support a finding of disability.  Yet, the ALJ discredited Dr. Doshi's opinion as unsupported by the objective findings and otherwise contradictory with other record evidence under the treating physician rule.  *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) ("The [treating physician] rule directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence.").

As Claimant points out, in the context of mental health impairments, it can certainly be more difficult to hone in on specific objective findings.  Notably, in this case both Dr. Doshi and Ms. Neely repeatedly documented Claimant's GAF score as 40-50 throughout the relevant time period.  Such a score range is indicative of "serious

symptoms," such as suicidal ideation, severe obsessional rituals, or frequent shoplifting or "any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work)." *Simpson v. Berryhill*, No. 17 CV 2299, 2018 WL 2238593, at *2 n.4 (N.D. Ill. May 16, 2018). Such scores seem to support Dr. Doshi's opinion. While the ALJ was not necessarily required to give weight to the GAF scores, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), on this record, his decision to discredit those scores as "limited" in "evidentiary value," seems to have been a result of improper cherry picking.

Further, the ALJ cited to Claimant's negative depression screenings at Claimant's visits for physical impairment issues. But it is not surprising that Claimant, who was already receiving regular treatment from a psychiatrist and counselor, chose not to delve into her mental health issues at visits with general practitioners.

Lastly, the ALJ seemed to rely too heavily on Claimant's daily activities, particularly that of raising her children, which she does with assistance. As the Seventh Circuit has cautioned, ALJs should avoid placing "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

The Court is of the opinion that all of these shortcomings leave the ALJ's decision without substantial support. As such, remand is required. On remand, the ALJ should better consider and articulate the combined effect, if any, of Claimant's morbid obesity and her other impairments (severe or not) on her ability to work.

### III. Conclusion

13

For the foregoing reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for proceedings consistent with this Opinion. It is so ordered.

_____
**The Honorable Michael T. Mason
United States Magistrate Judge**

**DATED: June 11, 2018**